**\*\*FOR PUBLICATION\*\***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ———————————————— : | Civil Action No. 15-6468 (FLW)(LHG) |
| NEW JERSEY DEPARTMENT OF : | |
| ENVIRONMENTAL PROTECTION, et al., : | **AMENDED OPINION** |
| : | |
| Plaintiffs, : | |
| : | |
| v. : | |
| : | |
| AMERADA HESS CORPORATION, et al., : | |
| : | |
| Defendants. : | |
| ———————————————— : | |

**WOLFSON, United States District Judge**:

Before the Court is the motion *in limine* of Defendants Exxon Mobil Corporation and

ExxonMobil Oil Corporation, on behalf of all Defendants ("Defendants"), for leave to file a

motion for partial summary judgment on the claims of the New Jersey Department of

Environmental Protection ("NJDEP"), the Commissioner of the New Jersey Department of

Environmental Protection, and the Administrator of the New Jersey Spill Compensation Fund

(collectively "Plaintiffs") for primary restoration natural resource damages under the New Jersey

Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 *et seq.* (the "Spill Act").[1] Plaintiffs

---

[1] In their Spill Act claim — Count III of the Fourth Amended Complaint — Plaintiffs seek to recover all categories of natural resource damages available under the Spill Act, including both primary restoration damages — for the cost of restoring resources to their pre-discharge condition — and compensatory restoration damages — for the lost use of the services and value of the contaminated resources during the period of their contamination pending restoration. *N.J. Dep't of Envtl. Prot. v. Exxon Mobil Corp.,* 393 *N.J. Super.* 388, 406 (App. Div. 2007). Defendants' present motion seeks to limit only Plaintiffs' ability to recover primary restoration damages. It does not seek to limit Plaintiffs' recovery of other categories of natural resource damages available under the Spill Act, *e.g.* compensatory restoration damages. Defendants' motion also does not dispute the availability of damages under Plaintiffs' common law and New Jersey Water Pollution Control Act, N.J.S.A. 58:10A-2 *et seq.*, claims.

seek recovery for groundwater contaminated with Methyl Tertiary Butyl Ether ("MTBE") at a

Bakers Gulf Service Station in Waldwick Borough, Bergen County, NJ; an Exxon Service

Station in Livingston Township, Essex County, NJ; a Getty Service Station in West Windsor

Township, Mercer County, NJ; an HP Delta Service Station in Woodbridge Township,

Middlesex County, NJ; and a Valero/APCO Service Station in Manalapan Township, Monmouth

County, NJ (collectively the "Trial Sites").[2] Defendants contend that because it is undisputed

that, once Defendants' existing, NJDEP-approved remediation plans are completed, the

contaminated groundwater at and around the Trial Sites will, eventually, through the process of

natural attenuation, reach pre-discharge concentrations of MTBE, Plaintiffs' claims for primary

restoration damages should be interpreted as seeking "expedited remediation." Defendants argue

that under "controlling" New Jersey state case law, Plaintiffs may recover primary restoration

damages for such expedited remediation efforts only where the groundwater contamination at

issue gives rise to "an injury or threat to human health, flora, or fauna." Defendants contend that

because Plaintiffs cannot meet this burden on the undisputed facts, Defendants should be granted

leave to move for summary judgment on Plaintiffs' claims for primary restoration damages.

Plaintiffs oppose Defendants' motion *in limine*, rejecting Defendants' suggested standard for

Plaintiffs' burden of proof, and instead argue that, under N.J.S.A. 58:10-23.11u.b.(4), Plaintiffs

---

[2] This matter was originally removed from the Superior Court of New Jersey, Law Division, Mercer County, on November 2, 2007, and was assigned case number 3:07-cv-5284. On January 3, 2008, the United States Judicial Panel on Multidistrict Litigation (the "MDL Panel"), issued an order transferring this matter to the United States District Court for the Southern District of New York for coordinated and consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. After pretrial proceedings before the Hon. Shira A. Scheindlin, U.S.D.J. (ret.) (the "MDL Court"), the MDL Panel, on April 15, 2015, entered a Conditional Remand Order, returning the action concerning the sites listed, *supra*, to this Court for trial. The matter was assigned the new case number of 3:15-cv-6468. On remand, this Court and the parties have referred to contaminated areas which are the subject of the action returned to this Court for trial as the "Trial Sites."

are entitled to damages for any primary restoration plan that is "practicable," meaning, as Plaintiffs interpret the statute, "available," "capable of being done," or "not impossible," without any further limitation. Accordingly, Plaintiffs argue that the issue of whether their claimed primary restoration plan is "practicable" is a question of fact that cannot be resolved on summary judgment.

For the reasons set forth below, the Court finds that Plaintiffs' burden of proof at trial on their claims for primary restoration damages will be to establish by a preponderance of the evidence that Plaintiffs' primary restoration plan is "practicable," meaning "reasonably capable of being done" or "feasible" in light of "site-specific realities," including but not limited to the estimated length of time required to complete the restoration plan, the cost of the restoration plan, the extent to which the restoration plan is concrete, nonabstract and readily implementable rather than abstract or conceptual, the regulatory approvals required for the restoration plan from authorities other than NJDEP, and any other legal obstacles or barriers to the implementation of the restoration plan, including, for example, the current ownership of contaminated sites and the legal authority of the responsible parties to conduct restoration work at the sites. Because this standard involves a detailed factual inquiry, likely, if not necessarily, requiring documentary evidence as well as the testimony of fact witnesses and experts, and because this Court rejects Defendants' proposed alternative standard of "an injury or threat to human health, flora, or fauna," a pretrial motion for partial summary judgment by Defendants on Plaintiffs' claims for primary restoration damages is not appropriate at this time. Defendants' motion *in limine* for leave to file such a motion is therefore DENIED.

I. BACKGROUND & PROCEDURAL HISTORY

In this matter, NJDEP seeks to recover natural resource damages from Defendants for the discharge of MTBE into groundwater at the Trial Sites. "MTBE is an organic chemical compound derived from methanol and isobutylene." *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.,* 725 F.3d 65, 80 (2d Cir. 2013).[3] Until the mid-2000s, MTBE was widely used in certain regions of the United States, including in New Jersey "as a fuel oxygenate, *i.e.,* an additive that reduces harmful tailpipe emissions by increasing the octane level in gasoline. By virtue of its chemical properties, however, spilled MTBE spreads easily into groundwater supplies." *Ibid.* The Second Circuit, on an appeal from the MDL Court, succinctly set forth the risks to groundwater associated with MTBE that have been identified by the United States Environmental Protection Agency ("EPA").

> MTBE is capable of traveling through soil rapidly, is very soluble in water . . . and is highly resistant to biodegradation. . . . MTBE that enters groundwater moves at nearly the same velocity as the groundwater itself. As a result, it often travels farther than other gasoline constituents, making it more likely to impact public and private drinking water wells. Due to its affinity for water and its tendency to form large contamination plumes in groundwater, and because MTBE is highly resistant to biodegradation and remediation, gasoline releases with MTBE can be substantially more difficult and costly to remediate than gasoline releases that do not contain MTBE.

*Id.* at 80 (quoting Methyl Tertiary Butyl Ether (MTBE), Advance Notice of Intent to Initiate Rulemaking Under the Toxic Substances Control Act to Eliminate or Limit the Use of MTBE as a Fuel Additive in Gasoline, 65 Fed. Reg. 16094, 16097 (proposed Mar. 24, 2000) (to be codified at 40 C.F.R. Part 755)).

---

[3] One of the consolidated matters before the MDL Court, *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, No. 00 MDL 1898 (SAS), 2009 WL 3347214 (S.D.N.Y. Oct. 19, 2009), *aff'd*, 725 F.3d 65 (2d Cir. 2013), which was brought by, *inter alia*, the City of New York, was tried to a jury before the MDL Court as a bellwether case, and the defendant, Exxon, appealed the final judgment to the Second Circuit in *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*

"Contamination of groundwater supplies by MTBE is undesirable because MTBE has a very unpleasant turpentine-like taste and odor that at low levels of contamination can render drinking water unacceptable for consumption. Further, although MTBE has not been classified as a human carcinogen by either the EPA or the National Toxicology Program, . . ., some toxicological studies show [that MTBE] can cause [DNA] mutations, . . ., which can possibly lead to cancer." *Ibid.* (quotations omitted). Accordingly, at least 25 states, including New Jersey, have banned the use of MTBE in gasoline because of the threat posed to groundwater. *See* N.J.S.A. 26:2C-8.22; Axline Cert. Ex. B, EPA Pub. A420-B-07-13, State Actions Banning MTBE (Statewide) (August 2007) (listing other state bans).

Because MTBE is a pollutant of groundwater that potentially poses a risk to human health, it is regulated by the New Jersey Safe Drinking Water Act, N.J.S.A. 58:12A-l *et seq*. ("NJSDWA"). NJSDWA sets maximum contaminant levels ("MCL") for various groundwater pollutants based on the threat posed to human health (*i.e.,* the safe drinking water standard). The current MCL for MTBE established under the NJSDWA is 70 ppb. New Jersey's health-based groundwater remediation standard for MTBE — known as the Ground Water Quality Standard ("GWQS") — is also 70 ppb, based on the MCL. *See* N.J.A.C. 7:26D-2.2; N.J.A.C. 7:9C-1.7(c)3.i; N.J.A.C. 7:9C, Appendix Table 1, Specific Groundwater Quality Criteria.

Plaintiffs' claims in this case concern discharges of MTBE at each of the Trial Sites, and the resulting contamination of the groundwater both at[4] and around[5] the sites with MTBE in concentrations exceeding the GWQS. Plaintiffs further contend, however, that at each Trial Site there is an off-site MTBE plume that is continuing to migrate through the groundwater, and that the off-site MTBE plumes have not been delineated, either horizontally or vertically, to pre-discharge conditions, meaning that it has not been determined how far the MTBE plumes have traveled away from the sites or how deep the plumes have spread into the underground aquifers. *See* Axline Cert., Exh. F, Aquilogic CFI Report at 50, 51; Exh. G, Aquilogic Exxon Report at 59, 60; Exh. H, Aquilogic Getty Report at 47; Exh. I, Aquilogic HP Delta Report, at 46; Exh. J, Revised Aquilogic HP Delta Report at 46 and Exh. K, Aquilogic Mobil Report at 43.

The Fourth Amended Complaint ("FAC") now before the Court presents six theories of liability for the MTBE groundwater contamination: strict product liability based on defective design (Count I), common law public nuisance (Count II), strict liability under the Spill Act (Count III), strict liability under the Water Pollution Control Act, N.J.S.A. 58:10A-1 to 35

---

[4] According to Plaintiffs, MTBE has been detected at high levels in groundwater at each trial site. *See* Axline Cert. Exhs. F – H and J - K (excerpts from site specific reports prepared by NJDEP's expert Anthony Brown). *See also* Axline Cert., Exh. F, Aquilogic CFI Report, at 11 (at the Gulf Waldwick site at concentrations of 2,500,000 ppb); Axline Cert., Exh. H, Aquilogic West Windsor Report at 10 (at the Getty West Windsor site at concentrations of 2,030,000 ppb); Axline Cert., Exh. G, Aquilogic Exxon Report at 42 (at the Exxon Livingston site, at concentrations of 234,000 ppb); Axline Cert. Exh. J, Aquilogic HP Delta Report at 10 – 15 (at the HP Delta Woodbridge site at concentrations of 242,000 ppb); and Axline Cert., Exh. K, Aquilogic Mobil Report at 28 (at the Mobil/Valero/APCO Manalapan site at concentrations of 224,000 ppb).

[5] Plaintiffs seek to introduce documents to show that, when monitoring wells were installed off-site, MTBE was also detected in groundwater at levels exceeding 70 ppb. *See* Aquilogic CFI Report at 11 (Gulf Waldwick 9,860 ppb off-site); Axline Cert., Exh. G, Aquilogic Exxon Report at 14 (Exxon Livingston 5,500 ppb off-site); Axline Cert., Exh. J, Aquilogic HP Delta Report at 10 (HP Delta Woodbridge 12,000 ppb off-site); Axline Cert., Exh. H, Aquilogic Getty West Windsor Report, at 20 (Getty West Windsor 2,770 ppb off-site). At the Mobil Manalapan site the responsible party has not yet installed off-site monitoring wells.

(Count IV), common law trespass (Count V), and common law negligence (Count VI). As part of their Count III Spill Act claim, Plaintiffs seek, *inter alia*, "all damages in an amount at least equal to the full cost of restoring the waters of the State to their original condition prior to the contamination of such waters with MTBE." FAC, Count III, Prayer for Relief, ¶ 141(d).

The parties came before this Court for a pretrial conference on March 30, 2017. Defendants represented that a dispute existed between the parties concerning the damages to which Plaintiffs might be entitled should the factfinder find in Plaintiffs' favor on their strict liability Spill Act claim.[6] Defendants stated that, in their understanding, Plaintiffs' Count III Spill Act claim sought primary restoration damages for the cost of restoring contaminated groundwater at the Trial Sites to its condition before contact with human civilization. Defendants argued that Plaintiffs were not entitled to recover such primary restoration damages, under controlling New Jersey law, where Defendants were already remediating the groundwater under NJDEP-approved remediation plans. Plaintiffs countered that they sought only to restore groundwater to its pre-discharge condition, and that under the plain language of the Spill Act, they would clearly be entitled to primary restoration damages over and above Defendants' existing remediation efforts should the factfinder find in Plaintiffs' favor. After hearing from the parties, the Court granted Defendants leave to file a "Restoration v. Remediation Motion" *in limine*, (i) setting forth the legal basis for their proposed standard of Plaintiffs' burden of proof

---

[6] The FAC includes a demand for trial by jury, but does not specify whether this request encompasses the strict liability Spill Act claim. The parties have not yet addressed whether Plaintiffs' Spill Act claim will be tried to a jury or the bench. *See, e.g. GEI Int'l Corp. v. St. Paul Fire & Marine Ins. Co.*, 287 N.J. Super. 385, 392, 671 A.2d 171, 174 (App. Div. 1996), *aff'd sub nom. In re Envtl. Ins. Declaratory Judgment Actions*, 149 N.J. 278, 693 A.2d 844 (1997) (no right to trial by jury for certain categories of litigation under the Spill Act). This Court's reference to a "factfinder" is thus made without deciding whether any issue under the Spill Act is a question for the jury or the Court.

for primary restoration damages and (ii) requesting a declaration from the Court of the applicable standard to assist the parties in preparing for or otherwise expeditiously resolving the present dispute.

The parties filed the completed briefing on the Restoration v. Remediation Motion on May 5, 2017. After reviewing the parties' submissions, the Court noted that neither Plaintiffs nor Defendants had addressed the case of *New Jersey Dep't of Envtl. Prot. v. Exxon Mobil Corp.*, No. UNN-L-3026-04, *slip op.* (N.J. Super., Law Div. Aug. 25, 2015) (the "*Bayway* Decision"), the most recent New Jersey state court decision discussing primary restoration damages under the Spill Act, and the *only* decision purporting to address directly the burden of proof for establishing such damages at trial. The Court requested supplementary briefing from the parties concerning the *Bayway* Decision on August 23, 2017. The parties filed their supplementary briefs on September 5, 2017.

## II. STANDARD OF REVIEW

The MDL Court set the deadline for the filing of dispositive motions at August 30, 2013. June 11, 2013 MDL Status Conference, Tr. at 81:23-82:7. At the June 11, 2013 MDL Status conference, the MDL Judge specifically clarified that all summary judgment motions, including case-specific summary judgment motions, should be filed in the MDL Court by that date. *Id.* at 78:23-79:7. *See generally* discussion *id.* at 77:13-79:7. The Court therefore interprets Defendants' motion seeking leave to file a motion for partial summary judgment as a request for modification of the existing dispositive motion schedule in this case under Fed. R. Civ. P. 16.

Federal Rule of Civil Procedure 16 governs pretrial management and scheduling orders. Under Rule 16(b)(4), a scheduling order "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). The burden is on the moving party to "demonstrate

good cause and due diligence." *Race Tires America, Inc. v. Hoosier Racing Tire Corp.,* 614 F.3d 57, 84 (3d Cir. 2010). "'Good cause' is understood to mean '[a] legally sufficient reason,' and it reflects 'the burden placed on a litigant (usu[ally] by court rule or order) to show why a request should be granted or an action excused.'" *Joseph v. Hess Oil Virgin Islands Corp.*, 651 F.3d 348, 351 (3d Cir. 2011), *as amended* (Oct. 10, 2012) (quoting *Black's Law Dictionary* 251 (9th ed. 2009)). "[D]etermining whether the showing made will justify granting the relief sought can be accomplished only by considering the specific nature and purpose of the rule at issue." *Id.* at 352. In its considerations, the Court should remain cognizant that "scheduling orders are at the heart of case management. If they can be disregarded without a specific showing of good cause, their utility will be severely impaired." *Koplove v. Ford Motor Co.,* 795 F.2d 15, 18 (3d Cir. 1986). In any event, however, the Court retains authority to modify case schedules to entertain motions resolving questions of law concerning which the facts are undisputed in order to "secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1.

III. ANALYSIS

In their Restoration v. Remediation Motion, Defendants contend that

[u]nder controlling law, where the responsible party is already remediating groundwater in accordance with NJDEP regulations and where such remediation has, or will, satisfy the NJDEP's applicable GWQS and return the water to "pre-discharge conditions," primary restoration damages are only potentially available where Plaintiffs can establish a need to accelerate the process. Specifically, Plaintiffs, as trustee of the State's natural resources, may only seek such damages where there is an injury or threat to human health, flora, or fauna that provides a reasonable basis or justification for an expedited (and thus more expensive) remediation strategy.

Mot. Br. 3. The "controlling law" upon which Defendants rely comprises three unpublished decisions: (1) "*Essex*" — *N.J. Dep't of Envtl. Prot. v. Essex Chem. Corp.*, No. MID-L-5685-07, slip op. at 9 (Law Div. 2010) (trial court opinion), *New Jersey Dep't of Envtl. Prot. v. Essex Chem. Corp.*, No. A-0367-10T4, 2012 WL 913042 (N.J. Super. Ct. App. Div. Mar. 20, 2012)

(affirming the trial court on appeal); (2) "*Union Carbide*" — *N.J. Dep't of Envtl. Prot. v. Union Carbide Corp.*, No. MID-L-5632-07, *slip op.* (N.J. Super. Ct., Law Div. Mar. 29, 2011); and (3) "*In re MTBE*" — *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, No. 1:00-1898, 2014 WL 630636 (S.D.N.Y. Feb. 18, 2014). Defendants contend that, under the heightened burden of "an injury or threat to human health, flora, or fauna" found in these cases, Plaintiffs cannot prove, on the undisputed facts, that that they are entitled to primary restoration damages in this case. According to Defendants, it is undisputed (i) that the responsible parties are already remediating MTBE in groundwater at the Trial Sites down to the GWQS under the supervision of NJDEP and in accordance with NJDEP's regulations; (ii) that MTBE levels in the groundwater at the Trial Sites will continue to decline through natural attenuation even after the responsible parties satisfy the 70 ppb GWQS and meet all other regulatory requirements for site remediation at each of the Trial Sites; (iii) that Groundwater at the Trial Sites remediated to the GWQS for MTBE will, as a result of natural attenuation, reach pre-discharge concentrations of MTBE at some point in the future;[7] and (iv) that there is no evidence in the record of a present

---

[7] Defendants support their contention that it is undisputed that natural attenuation will bring about a return of MTBE concentrations to pre-discharge conditions primarily through the expert reports and deposition testimony of Plaintiffs' expert Anthony Brown. In briefing, the parties strongly contest the import of certain of Brown's opinions and statements, particularly the following conclusion from his Rebuttal Report.

> If remedial actions only address contaminated groundwater detected by the monitoring well network to concentrations of 70 µg/l and 100 µg/l for MTBE and TBA, respectively, then some residual contamination will remain after the remedial actions. This residual contamination will continue to migrate. However, Mr. Brown concedes, and is of the opinion, that the natural attenuation processes in the subsurface should be sufficient to address such residual contamination in a reasonable period of time (assuming all of the contamination was delineated to background concentrations.").

Anthony Brown, *Rebuttal Report of Anthony Brown to Expert Opinions of Michael C. Kavanaugh*, Aquilogic, Inc., March 2013, at 4. Defendants contend that Brown's opinion is essentially a concession that natural attenuation ("NA") will bring about primary restoration. *See also* Anthony Brown, May 29, 2013 Dep. Tr. 271:4-20; 298:22-300:1; 358:14-359:10. In opposition, Plaintiffs focus on the parenthetical caveat at the close of Brown's Report to argue

injury done or threat posed to human health or the environment by MTBE-contaminated groundwater at the Trial Sites. Defendants therefore seek leave to file a motion for partial summary judgment in order to foreclose Plaintiffs from seeking primary restoration damages under the Spill Act.

In opposition, Plaintiffs contend that Defendants' proposed heightened legal standard for primary restoration damages is not found in the Spill Act, or the regulations promulgated thereunder, and argue that the only burden of proof imposed by the statute for the award of primary restoration damages is that any proposed primary restoration plan be "practicable," as set forth in N.J.S.A. 58:10-23.11u.b(4). The term practicable is not defined in the Spill Act, and so Plaintiffs argue that, under well-established New Jersey principles of statutory interpretation, it should be given its plain, ordinary, dictionary meaning of "available," "capable of being done," or "not impossible." Plaintiffs further argue that *Essex*, *Union Carbide*, and *In re MTBE* are distinguishable, and dispute Defendants' "undisputed facts."

A.  The *Bayway* Decision

As noted above, neither Defendants' Motion, nor Plaintiffs' Opposition originally addressed the opinion of the New Jersey Superior Court in the *Bayway* Decision. There, the court was asked to approve a settlement between the State of New Jersey and the responsible party defendants and to enter a consent judgment awarding the State damages under the Spill Act, including primary restoration damages. In so doing, the court first found, as a matter of first

---

that Brown only opined that NA will achieve primary restoration if the other elements of Plaintiffs' primary restoration plan are implemented, including, *inter alia*, the drilling of off-site monitoring wells. As explained below, the Court need not resolve this dispute of interpretation except to observe that Brown's opinion may not be as clear a concession as Defendants suggest. Here, the Court makes no ruling on the reliability or consistency of Brown's opinion, or the effect of that opinion, but merely notes that it could, on this record, be susceptible to Plaintiffs' reading so as to create a dispute of fact precluding summary judgment.

impression, that "Spill Act consent judgments, whether approved judicially or administratively, should be fair, reasonable, faithful to the objectives of the Spill Act, and in the public interest." *Bayway*, No. UNN-L-3026-04, N.J. Super., at 18. Under the reasonableness prong of the court's analysis, the court found that it was required to address, *inter alia*, whether the settlement amount appropriately reflected the relative strength of the parties' litigating positions and the attendant litigation risks were the parties to proceed to a verdict. *Id.* at 23; 46. This analysis required the court to set forth the State's burden of proof for each category of damages sought, including that for primary restoration damages.

The *Bayway* court held that "[u]nder N.J.S.A. 58:10-23.11u.b(4), the State has the burden of demonstrating, by a preponderance of the evidence, that any restoration plan is 'practicable.'" *Id.* at 50. Under this standard, the State "must take sites as it finds them when seeking to conduct primary restoration. This means that if certain site-specific realities make primary restoration non-practicable, the State may not conduct primary restoration. If this is the case, courts in turn cannot award primary restoration damages." *Id.* at 50-51. Importantly for this case, the parties in *Bayway* reached the settlement for which they sought court approval only after having presented their proofs at trial. The court, in evaluating the parties' litigation risks in proceeding to a verdict, was, therefore, able to review the evidence[8] the parties presented concerning the "practicability" of primary restoration in the case. The State produced an expert in historical ecology to opine on

---

[8] Under New Jersey Rule of Evidence 104(a), "[w]hen the qualification of a person to be a witness, or the admissibility of evidence . . . is in issue, that issue is to be determined by the judge." N.J.R.E. 104(a). Both the defendants and plaintiffs in *Bayway* filed Rule 104 motions to exclude the opposing experts. In the interest of judicial economy, and because the case was being tried as a bench trial, the *Bayway* court and the parties agreed to allow all experts to testify at trial and to have the court decide the Rule 104 motions post-trial and not consider any testimony by excluded experts in forming its opinion. *Id.* at 8. Any expert "evidence" introduced in the *Bayway* case was thus offered subject to the Superior Court's admissibility ruling, which was ultimately mooted by the settlement.

the pre-discharge condition of the contaminated sites; an expert in environmental engineering and engineering cost estimation to opine on the proposed restoration project and its overall cost for the contaminated sites; and an expert in engineering, project development, conceptual design, and cost estimation to provide a supporting opinion on the practicability of the proposed restoration work. *Id.* at 9-10. The defendants cross-examined the State's witnesses and presented their own evidence concerning "numerous potential difficulties the State would encounter or failed to consider when seeking to restore natural resources" at the contaminated sites. *Id.* at 51. "These realities included, but were not limited to, the estimated length of time to complete the work, the cost of the plan, the plan's highly conceptual nature, the fact that the plan would need approval and be monitored by many regulatory authorities, which the State had not considered, and the fact that [a responsible party] no longer owns the sites." *Id.* at 51.[9] The defendants also offered the testimony of their own expert in wetlands, construction and restoration of wetlands, estimation of costs of construction and restoration, ecotoxicology, and environmental toxicology to rebut the State's experts. *Id.* at 11, 51.

The *Bayway* court's discussion of the State's burden of proof for primary restoration damages under the Spill Act and its review of the evidence relevant to the application of that standard make it clear that, in that court's opinion, the NJDEP need only prove that its restoration plan is "practicable" as established by a factual inquiry into "site-specific realities," including but not limited to the estimated length of time required to complete the restoration

---

[9] As discussed in more detail below, one of the defendants' specific arguments mentioned in the *Bayway* Decision was that a refinery, not owned by any responsible party, operated at one of the contaminated sites and undermined the feasibility and effectiveness of restoration efforts, such that implementing the State's plan would require the refinery to cease operation. *Id.* 75-76. The *Bayway* court's discussion of restoration efforts at the site of this refinery is the only example of the application by the New Jersey courts of the practicability standard for primary restoration damages under the Spill Act.

plan, the cost of the restoration plan, the extent to which the restoration plan is concrete, nonabstract and readily implementable rather than abstract or conceptual, the regulatory approvals required for the restoration plan from authorities other than NJDEP, and any other legal obstacles or barriers to the implementation of the restoration plan, including, for example, the current ownership of contaminated sites and the legal authority of the responsible parties to conduct restoration work at the sites. The *Bayway* court's opinion also makes clear that these relevant facts may be established, first and foremost, through the admission of expert testimony.

Notably, nowhere did the *Bayway* court discuss the holdings of *Essex* or *Union Carbide*, or seek to apply their purported heightened burden of "an injury or threat to human health, flora, or fauna" in evaluating the State's litigation risks. This absence of discussion cannot be attributed to the *Bayway* court's ignorance of the *Essex* and *Union Carbide* decisions, as the same court, in an earlier memorandum opinion, made clear that it was aware of the defendants' argument that, based on *Essex* and *Union Carbide*, primary restoration damages should be barred. P. Supp. Br. Ex. A, *New Jersey Dep't of Envtl. Prot. v. Exxon Mobil Corp.*, No. UNN-L-3026-04, Letter Order, 4-5 (N.J. Super., Law Div. Feb. 10, 2014) (stating of *Essex* and *Union Carbide*, "[t]hese cases are unpublished. I have read them. They are not precedential and I am not obligated to accept their holdings in either or both in applying the law to the facts in this case. I am not required to follow their path, if in my opinion, the law, as applied to the facts in this case, draws me to different conclusions. . . . This case must rise or fall on its own merits."). The clear implication of the *Bayway* Decision is therefore that the Superior Court either rejected or found inapplicable the decisions in *Essex* and *Union Carbide*, because the heightened standard applied in those cases would have constituted a significant litigation risk to the State's claims for primary restoration damages.

14

In response to my request for supplementary briefing on the significance to the present motion, if any, of the *Bayway* Decision, Plaintiffs argue that the Superior Court's holding supports Plaintiffs' position (i) that the applicable burden of proof is the practicability of Plaintiffs' proposed primary restoration plan, (ii) that "practicable" means "available," "capable of being done," or "not impossible," and (iii) that whether restoration is practicable is a question of fact. Defendants contend that the *Bayway* court's adoption of the practicability standard of N.J.S.A. 58:10-23.11u.b(4) for the award of primary restoration damages "is entirely consistent with the legal precedent and arguments" advanced in Defendants' moving briefs. D. Supp. Br. 1. Despite this assertion, Defendants concede that the *Bayway* Decision shows that the "practicable" standard is "a multi-faceted concept that considers economics, logistics, regulators, and ownership" and takes into account "cost, timing, and other 'realities'" specific to the sites in question. D. Supp. Br. 2-3. Defendants also concede that the courts in *Essex*, *Union Carbide*, and *In re MTBE* resolved the issue of primary restoration damages without reference to the "where practicable" language appearing in the statute invoked by the *Bayway* Court. D. Supp. Br., 3-4. Defendants attempt to explain away this noticeable omission by arguing that, although the factual inquiry of practicability is a baseline requirement for Plaintiffs to prove primary restoration damages, the earlier unpublished decisions in *Essex*, *Union Carbide*, and *In re MTBE*, nevertheless impose a heighted burden on Plaintiffs to "justify" that their primary restoration plans are "necessary" in order to obtain expedited remediation where "it is an undisputed *reality* that impacted groundwater will reach pre-discharge conditions." D. Supp. Br., 3 (emphasis in original). In short, Defendants argue that a heightened standard greater than mere practicability applies in the limited circumstances presented in this case.

The proper burden of proof for primary restoration damages under the Spill Act is a question of New Jersey state law that has not yet been addressed by a controlling state authority, and so this Court is called upon to predict the interpretation that would be adopted by the New Jersey Supreme Court were the question before it. *See* discussion at III(C), *infra*. Reviewing the plain statutory language of the Spill Act, the unpublished decisions cited by the parties, and the persuasive opinion of the New Jersey Superior Court in the *Bayway* Decision, I do not adopt either of the parties' positions in their entirety. This Court rejects Defendants' proposed heightened standard of "an injury or threat to human health, flora, or fauna," because I find that Plaintiffs' burden of proof in seeking primary restoration damages, consistent with the plain and ordinary meaning of the uncontroverted language of the Spill Act at N.J.S.A. 58:10-23.11u.b(4), is to show that NJDEP's proposed restoration plan is "practicable." The Court also finds that "practicability" is a factual, not legal, inquiry, accomplished through the submission of fact and expert evidence, and not generally suitable for summary disposition. Plaintiffs are mistaken, however, in seeking to define "practicability" solely as that which is "available," "capable of being done," or "not impossible." Instead, this Court adopts the definition of "practicable" evidenced in the *Bayway* case, which relies upon an evaluation of site-specific realities and circumstances. As explained below, this standard is consistent with the plain and ordinary meaning of the relevant language of the Spill Act and the limited body of available New Jersey case law.

B.  Statutory Language

"When construing a statutory provision, a court's role is to discern and give effect to the Legislature's intent." *Morristown Assocs. v. Grant Oil Co.*, 220 N.J. 360, 380, 106 A.3d 1176, 1188 (2015) (citing *DiProspero v. Penn,* 183 *N.J.* 477, 492, 874 *A.*2d 1039 (2005)). "To do so,

[courts] focus on the plain language of the statute because it is 'the best indicator' of [that] intent." *Id.* (quoting *In re Plan for the Abolition of the Council on Affordable Hous.,* 214 *N.J.* 444, 467, 70 *A.*3d 559 (2013)). In reviewing "the statute's plain language[,]" courts "ascrib[e] to the words used their ordinary meaning and significance.'" *Farmers Mut. Fire Ins. Co. of Salem v. New Jersey Prop.-Liab. Ins. Guar. Ass'n,* 215 N.J. 522, 536, 74 A.3d 860, 868 (2013) (quoting *Murray, supra,* 210 *N.J.* at 592, 46 *A.*3d 1262). In other words, "[s]tatutory language should be interpreted in accordance with common sense in order to effectuate the legislative purpose." *Morristown Assocs.*, 183 N.J. at 492 (citing *N.E.R.I. Corp. v. N.J. Highway Auth.,* 147 *N.J.* 223, 236, 686 *A.*2d 328 (1996)).

"Further, when discerning legislative purpose and intent, the Court can consider the entire legislative scheme of which a particular provision is but a part." *Id.* (citing *Kimmelman v. Henkels & McCoy, Inc.,* 108 *N.J.* 123, 129, 527 *A.*2d 1368 (1987)). "Here the Legislature expressly stated its intended general purposes upon enactment of the Spill Act. A central Spill Act purpose is 'to provide liability for damage sustained within this State as a result of any discharge of [petroleum products and other hazardous] substances, by requiring the prompt containment and removal of such pollution and substances.'" *Id.* (quoting *N.J.S.A.* 58:10– 23.11a.). The Act further declares that the State is "the trustee, for the benefit of its citizens, of all natural resources within its jurisdiction." *N.J.S.A.* 58:10–23.11a. The courts of New Jersey have consistently concluded that the Spill Act is "'a pioneering effort by government to provide monies for a swift and sure response to environmental contamination.'" *N.J. Dep't. of Envtl. Prot. v. Exxon Mobil Corp.,* 393 *N.J. Super.* 388, 398 (App. Div. 2007) (quoting *Marsh v. N.J. Dep't of Envtl. Prot.,* 152 *N.J.* 137, 144 (1997)).

The Act provides that persons who are responsible for the discharge of hazardous substances are strictly liable, without regard to fault, for all cleanup and removal costs. *N.J.S.A.* 58:10–23.11g(c)(1). The term "cleanup and removal costs" is defined in the Act as "all direct costs associated" with the discharge of a hazardous substance, as well as those "indirect costs" incurred in the

> (1) removal or attempted removal of hazardous substances, or (2) taking of reasonable measures to prevent or mitigate damage to the public health, safety, or welfare, including, but not limited to, public and private property, shorelines, beaches, surface waters, water columns and bottom sediments, soils and other affected property, including wildlife and other natural resources. . . .

*N.J.S.A.* 58:23.11b. As relevant to the present motion, the Spill Act also authorizes NJDEP to commence a civil action for "the cost of restoration and replacement, where practicable, of any natural resource damaged or destroyed by a discharge[.]" N.J.S.A. 58:10-23.11u.b.(4). "Restoration," as used in the Spill Act, means "return to [the natural resource's] pre-discharge condition." *Exxon Mobil,* 393 N.J. Super. at 406, 923 A.2d at 356. "Natural Resources" are defined to include "all land, fish, shellfish, wildlife, biota, air, waters and other such resources owned, managed, held in trust or otherwise controlled by the State." N.J.S.A. 58:10:23-11b. "Waters" include "groundwater," like that alleged to have been contaminated in this case. *Ibid.*

I note that the term "restoration" of natural resources is legally distinct from the "remediation" of contaminated sites. As the Appellate Division of the Superior Court has explained, remediation concerns the reduction of contaminants "to risk-based standards," which task "is different from 'restoration' of natural resources," which concerns the reduction of contaminants "to pre-discharge conditions (primary restoration)," and is different from "replacement of the ecological services and values lost through compensation (compensatory restoration)." *Exxon Mobil*, 393 N.J. Super. at 406, 923 A.2d at 356. "Remediation," then, is just

one of the processes covered by the broad definition of "cleanup and removal costs," while restoration of natural resources is another. *Ibid.*[10]

The term "practicable," however, is not defined in the Spill Act, nor has it been defined by a New Jersey court. N.J.S.A. 58:10-23.11u.b.(4) ("the cost of restoration and replacement, *where practicable*, of any natural resource damaged or destroyed by a discharge[.]" (emphasis added)). This Court therefore must construe the term consistent with its plain and ordinary meaning. Although no New Jersey Court has expressly stated the meaning of the "where practicable" language in the Spill Act itself, the New Jersey Supreme Court recently held, in the context of other statutes, that the plain and ordinary meaning of the term "practicable" is "reasonably capable of being accomplished; feasible in a particular situation." *IE Test, LLC v. Carroll*, 226 N.J. 166, 182, 140 A.3d 1268, 1278 (2016) (quoting *Black's Law Dictionary* 1456 (10th Ed. 2014)). *See also State v. Regis*, 208 N.J. 439, 448, 32 A.3d 1109, 1114 (2011) (finding in the context of another statute that "practicable" means "reasonably capable of being accomplished; feasible"). Because a judicial finding of the plain and ordinary meaning of a word looks first to the language used in a statute on its face, this Court finds no reason why the New Jersey Supreme Court's plain and ordinary definition of "practicable" should not be applied in the Spill Act context. Moreover, I find that the definition of "practicable" as "reasonably capable of being accomplished; feasible in a particular situation," is consistent with the legislative intent of providing prompt containment and removal of contaminants of the State's natural resources.

In ascertaining the applicable standard, I also explicitly reject the Plaintiffs' proposed standard that "practicable" means merely "available," "capable of being done," or "not

---

[10] The Spill Act makes clear that the payment of primary restoration damages is not a component of remediation. N.J.S.A. 58:10-23.11b. ("'remediation' or 'remediate' shall not include the payment of compensation for damage to, or loss of, natural resources.").

impossible," without consideration of factual circumstances going to the reasonableness or feasibility of the restoration plan under site-specific conditions. Adopting Plaintiffs' "not impossible" standard — limiting the state's recovery of damages only for those restoration plans that are not technologically or legally capable of being done — would effectively read the "where practicable" language out of the Spill Act. As discussed, *supra*, the *Bayway* court clearly considered evidence proffered by the fact and expert witnesses of plaintiffs and defendants in its consideration of the practicability of the State's proposed primary restoration plan in that case, which evidence included *but was not limited to* evidence of technological or legal impossibility.

The *Bayway* court applied its practicability standard to only one specific set of facts in its opinion, to which this Court may look for an example. At one of the contaminated sites subject to the *Bayway* litigation, Morses Creek, Exxon, the responsible party, no longer owned the contaminated land and riparian rights. *Bayway*, No. UNN-L-3026-04, N.J. Super., at 75. An unrelated third party, Phillips, operated a refinery on the site, which was permitted by NJDEP to utilize Morses Creek to discharge 30 million gallons of water per day. *Id.* at 75-6. During the trial, Exxon introduced evidence and cross-examined the State's experts to attempt to show that primary restoration of Morses Creek was not practicable while the refinery continued in operation. *Id.* at 75. This evidence was only the tail-end of a two-decade dispute between the parties about whether remediation and restoration work could occur while the refinery still operated. *Ibid.* As part of the consent judgment, therefore, the parties agreed to defer remediation and primary restoration of Morses Creek until such a time as the refinery either ceased operation or technology became available to allow the refinery to operate without discharging 30 million gallons of water per day into the Creek. *Id.* at 76. Environmental groups challenged this feature of the consent judgment, and the *Bayway* court was called upon to rule on the reasonableness of

the parties' compromise in light of the evidence introduced concerning practicability. The *Bayway* court considered Exxon's evidence that the discharge of 30 million gallons of water per day raised questions about the possibility of restoration work on the site or at the very least undermined the effectiveness of such efforts, and that there would likely be legal obstacles to Exxon's attempting to force Phillips to close the refinery for Exxon to conduct remediation and restoration work. [11] *Id.* at 75-76. The court, however, never appeared to doubt that remediation and restoration of the site were, strictly speaking, "possible" or "capable of being done" because it was within NJDEP's power to revoke the refinery's permit to discharge the water (and thereby eliminate its ability to operate). Instead, the court found only that the consent judgment was reasonable because "[t]he public interest would not be served by an ineffective or incomplete Morses Creek remediation. Nor would it be served through the unintended consequence of closing the refinery." *Id.* at 78. The *Bayway* court's analysis of the Morses Creek site thus suggests that the standard for practicability involves the State showing more than that a primary restoration plan is merely possible, or not impossible, to implement.

This Court's conclusion that "practicable" does not mean merely "possible" is bolstered by the holding of the New Jersey Supreme Court in *State v. Hudson*, 209 N.J. 513, 39 A.3d 150 (2012). There, the New Jersey Supreme Court was called upon to interpret a criminal statute.

> Subsection b pertains when "sentences of imprisonment [are] imposed at different times," and provides that "[w]hen a defendant who has previously been sentenced to imprisonment is subsequently sentenced to another term for an offense committed prior to the former sentence . . . (1) The multiple sentences imposed shall *so far as possible* conform to subsection a. of this section."

---

[11] In the matter now before the Court, Defendants have similarly indicated that there may be issues of third-party ownership or responsibility for contamination at several of the Trial Sites. Mot. Br., 2 n. 2.

*Hudson*, 209 N.J. at 517 (citing N.J.S.A. 2C:44–5(b)(1)) (emphasis added). The meaning of the phrase "so far as possible" divided the Court, and Justice Patterson, in dissent, proposed that "[t]he crucial word 'possible' has a variety of definitions," including in some circumstances being defined as "'practicable' or 'reasonable.'" *Hudson*, 209 N.J. 513, 540, 39 A.3d 150, 166 (2012) (Patterson J., dissenting). Justice Patterson was thus more amenable to the State's interpretation of the statute which sought to read "so far as possible," *id.* at 534, 547, in a manner more akin to "where practicable." The majority soundly rejected the State's and the dissent's construction, finding that

> Those interpretations are not apparent from the plain language for that is not what subsection b says. The word choice is "possible," not "practicable" or "preferable" or "presumptive." We cannot rewrite the Legislature's words; we can only enforce the language as it is written.

*State v. Hudson*, 209 N.J. 513, 534, 39 A.3d 150, 162 (2012). Having explicitly rejected a party's attempt to read "possible" as "practicable" in one matter, this Court finds it extremely unlikely that the New Jersey Supreme Court would be persuaded to read "practicable" as "possible" or "not impossible" in another. In sum, therefore, the plain and ordinary meaning of the term "practicable" supports this Court's construction as "reasonably capable of being accomplished; feasible in a particular situation."

C.  Lower Court Unpublished Decisions in the Absence of Supreme Court Precedent

Because the Court has already found that under the plain meaning of the Spill Act's statutory language, Plaintiffs' burden of proof is to show by preponderance of the evidence primary restoration damages based on a plan that is "practicable," and Defendants cite to no statutory basis for their alternative "an injury or threat to human health, flora, or fauna" standard, the only question remaining before the Court on the present motion is whether there is a judge-made requirement over and above practicability. This Court first observes that there are neither

22

decisions by the New Jersey Supreme Court, nor any published decisions by any New Jersey court endorsing Defendants' standard. As such, this Court could find, without any analysis, that no heightened standard of proof beyond practicability has been imposed by the New Jersey courts, simply because there is no *controlling law* from which such a standard might be derived. *See* N.J. Prac. R. 1:36–3 ("[n]o unpublished opinion shall constitute precedent or be binding upon any court."); *Taransky v. Sec'y of U.S. Dep't of Health & Human Servs.*, 760 F.3d 307, 317 n. 9 (3d Cir. 2014). The Court shall nevertheless consider Defendants' arguments as seeking a declaration of the law of New Jersey in the first instance from this Court, rather than as seeking this Court's compliance with controlling law already articulated by the controlling authority of some New Jersey court.

In the absence of guidance from the New Jersey Supreme Court as to the applicable burden of proof for Plaintiffs to establish a claim for primary restoration damages, "'we must attempt to predict how that tribunal would rule.'" *Taransky*, 760 F.3d at 316 (citing *U.S. Underwriters Ins. Co. v. Liberty Mut. Ins. Co.,* 80 F.3d 90, 93 (3d Cir. 1996)). "In carrying out that task, we must consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand." *Covington v. Cont'l Gen. Tire, Inc.*, 381 F.3d 216, 218 (3d Cir. 2004) (citing *Packard v. Provident Nat. Bank,* 994 F.2d 1039, 1046 (3d Cir. 1993)). "[T]he decisions of state intermediate appellate courts, which, '[a]lthough not dispositive, ... should be accorded significant weight in the absence of an indication that the highest state court would rule otherwise.'" *Taransky*, 760 F.3d at 316 (quoting *Orson, Inc. v. Miramax Film Corp.,* 79 F.3d 1358, 1373 n. 15 (3d Cir. 1996)). "While unpublished opinions are not binding on New Jersey courts, [the federal courts] may refer to them when predicting state law." *Taransky*, 760

F.3d at 317 n. 9 (citing *Stengart v. Loving Care Agency, Inc.,* 201 N.J. 300, 990 A.2d 650, 655 n. 4 (2010); *Packard,* 994 F.2d at 1042)).

The key case upon which Defendants rest their argument on this motion, *Essex*, is also the only New Jersey state appellate division case substantively addressing the issues of primary restoration damages in the context of groundwater contamination. 2012 WL 913042, at *1-2. Understanding the *Essex* decision requires a brief discussion of the enforcement structure of NJDEP. The Site Remediation Program ("SRP") arm of NJDEP oversees the remediation of contaminated sites under the Spill Act. Under New Jersey's 2009 Site Remediation Reform Act, N.J.S.A. 58:10C-1, et seq., a remediating party must pay for an independent Licensed Site Remediation Professional ("LSRP") who is authorized to conduct investigations, approve remedial alternatives, and determine when remediation is complete, on behalf of SRP. A separate arm of NJDEP, the Office of Natural Resource Restoration ("ONRR"), oversees NJDEP's efforts to obtain natural resource damages, including through the filing of civil actions like the case at bar.

At the time of the suit in *Essex*, the defendant responsible party was in the process of remediating groundwater at a contaminated site to pre-discharge levels under the supervision of NJDEP's SRP. *Id.* at *2-5. Offsite groundwater had also been contaminated, but it was undisputed that, as a result of the defendant's on-site, NJDEP-approved remediation efforts, the off-site contamination would also reach pre-discharge levels at some point in the future. *Id.* at *4-6. The *Essex* defendant employed a pump-and-treat system — in which contaminated groundwater was pumped out of the subsurface and chemically treated to neutralize contaminants — and in-situ bioremediation — in which microorganisms were inserted into the subsurface to metabolize the contaminants into less harmful compounds — in order to achieve

24

SRP's remediation goals. *Id.* at *4-5. ONRR brought suit against the *Essex* defendant under the Spill Act seeking damages for a primary restoration project, over and above the ongoing remediation, to return the groundwater to pre-discharge conditions more quickly than would occur through the existing remediation program. *Id.* at *6-7. The trial court found that NJDEP, specifically ONRR, was not entitled to primary restoration damages because it had failed to carry its burden to show a compelling reason why remediation at the site should be expedited to achieve primary restoration sooner than was anticipated under the existing SRP-approved plan. *N.J. Dep't of Envtl. Prot. v. Essex Chem. Corp.*, No. MID-L-5685-07, slip op. at 9 (Law Div. 2010). The court stated:

> Although there has been an injury to the groundwater itself, the contamination has not affected any flora or fauna nor has it affected the health and/or safety of the people of this State. Primary restoration efforts made by Essex have been approved by SRP and have been shown to be effective. There is no compelling reason as to why remediation of this particular site should be expedited.

*Ibid.*

The Appellate Division affirmed, denying all primary restoration damages, holding that

> Plaintiffs did not show that there was a need to restore the properties to pre-discharge conditions within ten years, particularly when there was no evidence showing that the hazardous substances remaining on the properties were causing harm to any of the flora and fauna or posed any threat to the public health, safety or welfare.

*Essex*, 2012 WL 913042, at *7.

Defendants also invoke the trial court decision in *Union Carbide*, in which primary restoration damages were also denied on similar grounds. No. MID-L-5632-07, slip op. at 7 (Law Div. Mar. 29, 2011). As in *Essex*, at the time of the suit in *Union Carbide*, the defendant responsible party was remediating contaminated groundwater under NJDEP SRP supervision. Specifically, the defendant was "cleaning the groundwater to GWQS, which tolerate measurable concentrations of many chemicals at levels that do not affect health or safety." *Id.* at 6-7. The

undisputed facts suggested that these remediation activities would take an additional 30 to 36 years to return the groundwater to pre-discharge conditions. *Id.* at 6. The ONRR brought suit, seeking damages for a $500,000 primary restoration plan to return groundwater to pre-discharge conditions within 8 to 9 years. *Id.* at 7. As in *Essex*, the *Union Carbide* court denied NJDEP's claim for primary restoration damages:

> This Court finds that Plaintiffs have not shown why they are entitled to expedited primary restoration. Defendants are currently remediating the property to the satisfaction of the SRP and Plaintiffs have not cited any authority as to why restoration must be completed in a shorter time frame. Plaintiffs failed to show that the groundwater, in its current state, poses any risk to human health or environmental safety that would justify an expedited cleanup. The Defendant has been working closely with the SRP and has been in full compliance with the requests of the SRP. This Court finds no basis to intervene when a division of the NJDEP has stated that it has no objection to the current primary restoration plan.

*Id.* (emphasis added). Again, a central concern of the court appeared to be that SRP had approved a plan remediating the contaminated groundwater to the GWQS, and ONRR had then brought suit to expedite the ongoing remediation.

These unpublished cases, cited by Defendants in support of their motion, are, however, distinguishable from the case at bar because of the nature of the SRP-approved remediation plans there compared to those approved in this case. As discussed above, SRP approves remediation plans to Ground Water Quality Standards, or GWQSs, which are based on the threat posed by contaminants to human health. The GWQSs are set forth for each contaminant regulated by NJDEP at N.J.A.C. 7:9C. The GWQS is composed of a Ground Water Quality Criterion ("GWQC"), which sets forth the allowable concentration in groundwater of a given contaminant in parts per billion, and a Practical Quantitation Level ("PQL"), which sets forth the lowest concentration of the contaminant that can practically be measured in groundwater using current technology. The applied GWQS is the higher of the PQL and the GWQC — because even if a

26

concentration lower than the PQL would be beneficial to human health and therefore constitute the GWQC, it would not be practical for a responsible party to measurably achieve that concentration.

In the lone state appellate decision upon which Defendants rely, *Essex*, and in the state trial court decision in *Union Carbide*, the discharge in question was not of MTBE, but rather of a number of other chemicals associated with refined petroleum products, including, *inter alia*, benzene, vinyl chloride, trichloroethylene ("TCE"), and tetrachloroethylene ("PCE"). *See* June 25, 2007 Complaint in *New Jersey Dep't of Envtl. Prot. v. Essex*, ¶ 17; June 25, 2007 Complaint in *New Jersey Dep't of Envtl. Prot. v. Union Carbide*, ¶¶ 30-37. This fact is significant because the GWQCs for these and a number of the other discharged chemicals in those cases, are less than or equal to the PQLs for those chemicals. *See* N.J.A.C. 7:9C, Ground Water Quality Standards (benzene - GWQC of 0.2, PQL of 1; vinyl chloride - GWQC of 0.08, PQL of 1; TCE - GWQC of 1, PQL of 1; PCE - GWQC of 0.4, PQL of 1). In other words, the GWQCs for those chemicals were at or below the smallest readily measurable amounts detectible by sampling, and so the GWQS for each chemical was set at the PQL. The remediation plans approved by the SRP of NJDEP in *Essex* and *Union Carbide* covered the reduction of the concentration of the discharged chemicals in the affected groundwater from the amount detected at initial sampling down to the GWQSs, which were each the lowest measurable concentration. Because these chemicals, like MTBE, are not naturally occurring in groundwater, the pre-discharge level of each was at or near zero ppb but, the concentration of each chemical could only practically be measured down to the PQL. Accordingly, the plans that the SRP approved to remediate the sites in *Essex* and *Union Carbide* covered the reduction of the concentration of the discharged chemicals down to the only measurable pre-discharge level; in other words, *the remediation*

*plans in those cases necessarily also achieved primary restoration*. In that context, therefore, the

Courts in *Essex* and *Union Carbide*, reasoned that once a division of NJDEP, the SRP, had

approved a plan to achieve both remediation and primary restoration, another division of NJDEP,

the ONRR, could not separately seek expedited primary restoration, which in those cases was the

same as expedited remediation, without meeting some heightened standard.

Although, the courts in *Essex* and *Union Carbide* did not identify the source of their

heightened standard, that the State must prove "an injury or threat to human health, flora, or

fauna," one likely origin is found in NJDEP's own regulations governing remediation. Under

NJDEP regulations, the responsible party conducting remediation is required to comply with

certain mandatory timeframes, set by SRP, in which to achieve various remediation objectives.

N.J.A.C. 7:26C-3.3. Defendants have represented that such mandatory timeframes are in place

for the Trial Sites in this case, and have been approved by SRP. Under the regulations, SRP

"may establish an expedited site specific remediation timeframe that shall apply to a particular

site," but must set such an expedited timeframe only based on:

1.   The risk to the public health and safety, or to the environment; and

2.   The compliance history of the person responsible for conducting the remediation.

N.J.A.C. 7:26C-3.4(a). The regulations further provide that NJDEP must give notice of such

expedited timeframes to the responsible party, and provide a procedure through which a

responsible party may seek an extension of the expedited timeframe. *Id.* at 7:26C-3.4(b), 3.4(e),

3.5. Once mandatory timeframes have been set for *remediation*, therefore, it appears that

NJDEP's own regulations impose some consideration of "[t]he risk to the public health and

safety, or to the environment" before an *expedited* remediation timeframe may be imposed. The

Courts in *Essex* and *Union Carbide* therefore did not overstep their judicial roles merely by

imposing a similar standard to that required of NJDEP had it proceeded administratively rather than in a court proceeding.

The critical distinction between the case now before the Court and those before the courts in *Essex* and *Union Carbide* is that the GWQS for MTBE is not set at the PQL. The PQL for MTBE is 1 ppb, or the smallest practically measurable amount. N.J.A.C. 7:9C. The GWQC (and thus also the GWQS) for MTBE is 70 ppb, far exceeding the smallest measurable amount.[12] As mentioned above, because MTBE is not naturally occurring in groundwater, for primary restoration to pre-discharge conditions to occur, its level must be reduced to zero, or, in practice, the PQL. Here, Defendants do not dispute that the SRP-approved remediation plans for the Trial Sites in this case only cover the reduction of MTBE from the discharged level to the GWQS, not to the PQL, or pre-discharge level. Mot. Br., 2 ("It is undisputed that responsible parties are already remediating MTBE in groundwater at the trial sites down to the GWQS under the supervision of NJDEP"). Accordingly, unlike *Essex* and *Union Carbide*, the NJDEP has never approved a remediation plan by any of the Defendants that would cover the reduction of MTBE levels to pre-discharge levels. In other words, the approved remediation efforts in this case will not themselves bring about primary restoration. This is, therefore, not a case in which NJDEP is seeking expedited remediation; the remediation plans terminate at the GWQS. Instead, the ONRR component of NJDEP is seeking separate, primary restoration, to cover the process of returning MTBE levels in groundwater to pre-discharge levels.

---

[12] In their Opposition Brief, Plaintiffs raised the fact that, in *Essex*, unlike the case at bar, "the remediation standard for the contaminant[s] at issue (1 ppb) was the same as the pre-discharge condition (1 ppb), so remediation at the site, which was being overseen by SRP would also necessarily achieve primary restoration." Opp. Br., 28 (emphasis in original). Defendants failed to respond to this critical, distinguishing fact in their Reply briefing.

Defendants attempt to harmonize the facts of this case with those of *Essex* and *Union Carbide* by asserting that because once the responsible parties have remediated groundwater at the Trials Sites down to the GWQS for MTBE, the process of natural attenuation ("NA") will, without action by Defendants, continue to reduce the concentration of MTBE down to pre-discharge levels over an undefined period of time, the remediation plans of Defendants in this case should be viewed as equivalent to those in the cited unpublished cases. This Court disagrees for two reasons. Firstly, Plaintiffs dispute whether NA will in fact bring about the reduction to pre-discharge conditions. Opp., 13. Accordingly, even if the Court were inclined to accept Defendants' argument, disputes of fact would still prevent a motion for partial summary judgment based upon the *Essex* standard.

Secondly, this Court has not found, and Defendants have not cited, any authority suggesting that the inevitability of a contaminant reaching pre-discharge levels through no action of the Defendants is equivalent to the active conduct of the Defendants bringing about such a reduction through an SRP-approved remediation plan. Instead, I note that there are a number of problems with Defendants' conflation of the circumstances in *Essex*, where the NJDEP-approved remediation plan achieved primary restoration, and those in the case at bar, where the NJDEP-approved remediation plans do not. NA is not an approved method of remediation recognized by the NJDEP or the EPA; only Monitored Natural Attenuation ("MNA"), involving the continued active participation of responsible parties using monitoring wells to track contaminant concentrations over time, is so recognized. Opp. 34; New Jersey Dep't of Envtl. Prot., Site Remediation Program, *Monitored Natural Attenuation Technical Guidance* (March 1, 2012) ("MNATG"), 1-4. In apparent recognition thereof, Defendants proffer to the Court that they will undertake MNA, rather than allowing NA to take its course, if required by NJDEP. Rep. Br. 11

n. 7 ("Plaintiffs' distinction between monitored natural attenuation and natural attenuation (Opp.

at 33-35) is unnecessary; if NJDEP requires Responsible Parties to employ *monitored* natural

attenuation, then those parties will employ monitored natural attenuation at the trial sites."). At

present, however, Defendants' offer to employ MNA, *if required*, essentially admits that there is

no plan for MNA in place, only an alleged scientific expert consensus that NA will achieve

primary restoration at some undefined point in the future. The contradiction, that troubled the

courts in *Essex* and *Union Carbide*, of one arm of NJDEP approving a remediation plan at set

timeframes, and another arm then suing in a civil action to expedite those same timeframes, is

therefore absent from this case.

Further, as a remediation method, MNA is subject to scrutiny and approval by regulators

like NJDEP and the EPA before it may be employed as part of a remediation or restoration

effort. *See, e.g.*, N.J.A.C. 7:26E-5.1(d). Those authorities clearly hold that it is not an appropriate

method for deployment in all circumstances. Specifically, New Jersey's Monitored Natural

Attenuation Technical Guidance, incorporating the EPA's guidance, while not controlling law,

provides insight into NJDEP's approval or rejection of the deployment of MNA. MNATG at 4

("Consistent with United States Environmental Protection Agency (USEPA) guidance . . . MNA

is not appropriate for every site." (citing USEPA, Office of Solid Waste and Emergency

Response, Dir. No. 9200.4-17P (Apr. 21, 1999) ("USEPA Directive")). Pointedly, the guidance

documents caution that MNA may not be an appropriate method for the remediation of MTBE.

> For example, Benzene, Toluene, Ethylbenzene and Xylenes (BTEX) associated with
> gasoline have been shown in many circumstances to be effectively remediated by natural
> attenuation processes. However, a common additive to gasoline (*i.e.*, methyl tertiary-
> butyl ether [MTBE]) has been found to migrate large distances and threaten
> downgradient water supplies at the same sites where the BTEX component of a plume
> has either stabilized or diminished due to natural attenuation. In general, compounds that
> tend not to degrade readily in the subsurface (*e.g.*, MTBE and 1,4-dioxane) and that

represent an actual or potential threat should be assessed when evaluating the
appropriateness of MNA remedies.

USEPA Directive at 5. The EPA's guidance also emphatically states that MNA may only be used

where remediation may be achieved through its use within a reasonable time.

> EPA expects that **MNA will be an appropriate remediation method only where its use
> will be protective of human health and the environment and it will be capable of
> achieving site-specific remediation objectives within a timeframe that is reasonable
> compared to other alternatives.** The effectiveness of MNA in both near-term and long-
> term timeframes should be demonstrated to EPA (or other overseeing regulatory
> authority) through: 1) sound technical analyses which provide confidence in natural
> attenuation's ability to achieve remediation objectives; 2) performance monitoring; and
> 3) contingency (or backup) remedies where appropriate. **In summary, use of MNA does
> not imply that EPA or the responsible parties are "walking away" from the cleanup
> or financial responsibility at a site.**

EPA Directive at 13 (emphasis in original). Here, Defendants present no timeframe in which

natural attenuation will allegedly reduce the level of MTBE contamination at and around the

Trial Sites to pre-discharge conditions, instead only noting that it is undisputed that it will occur

at some point in the future. Moreover, in addition to incorporating the EPA's directives, New

Jersey's Guidance also provides for specific situations in which MNA is precluded as the sole

groundwater remediation remedy, including an "Expanding Ground Water Plume: An expanding

ground water plume indicates that contaminant release exceeds the natural attenuation capacity

of the system to control the contaminants. (e.g., N.J.A.C. 7:26E-6.3(e)1i(4))." MNATG, 5.

Plaintiffs contend that such expanding, undelineated plumes are present at the Trial Sites in this

case.[13] The facts of this case, coupled with NJDEP's guidance documents, therefore raise

---

[13] Defendants, again, appear to contend that the expert reports and deposition testimony of
Plaintiffs' expert Anthony Brown resolve the question of whether MNA is an appropriate, and
independently sufficient, method for restoration of the Trial Sites. I therefore clarify once more
that the present motion does not require this Court to pass judgment on the opinions of the
parties' experts, nor, indeed, could the Court do so, having been presented only with fragments
of reports and deposition excerpts.

questions whether MNA would have been approved as a remediation technique for the Trial

Sites in the absence of the additional measures being proposed in Plaintiffs' primary restoration

plan. Defendants' theory would require not only the assumption that such approval would be

given under the conditions of the existing remediation plans, but also require viewing the

existing remediation plans as if they already included an MNA component bringing MTBE

concentrations down from the GWQS to pre-discharge levels. The holdings of *Essex* and *Union

Carbide* therefore dealt with different facts and circumstances than those before this Court, and

so any standard formulated by the courts in those non-binding opinions does not fit the case at

bar.

Finally, defendants invoke the holding of the MDL Court in *In re MTBE* in support of

their motion. There, the MDL Court appeared to adopt a modified standard from *Essex*,

including a cost component, and applied that standard, for the first time, to MTBE

contamination.[14]

> The right to recover primary restoration costs under the Spill Act is well
> established. However, the Superior Court of New Jersey, Appellate Division has held that
> primary restoration costs may be denied where the plaintiff has not shown that its
> "proposed [restoration] plan would justify the cost, or that the public would be harmed if
> [the defendant's plan were implemented]." Thus, plaintiffs bear the "burden of proof on
> primary restoration damages."

*In re MTBE*, 2014 WL 630636, at *3.

In the end, however, the MDL Court's decision that the plaintiffs had failed to carry their

burden was not based on their failure to "justify the cost" of their plan or to demonstrate "that the

---

[14] In a footnote, the MDL Court summarized the *Essex* standard as follows: "[a]lthough the
[*Essex*] trial court recognized an injury to the groundwater itself, it observed that primary
restoration costs were not appropriate, in part because 'contamination [had] not affected any
flora or fauna nor [had] it affected the health and/or safety of the people of [New Jersey].'"). *Id.*
at *4 (quoting *New Jersey Dep't of Envtl. Prot. v. Essex Chem. Corp.,* No. A–0367–10T4, 2012
WL 913042, at *7 (N.J. Super. Ct. App. Div. Mar. 20, 2012)).

public would be harmed." Instead, the MDL Court found that the damages sought were for

investigation only, not primary restoration, and that plaintiffs' own expert report failed to state

definitively that there were any primary restoration damages in the case.

> But plaintiffs do not seek to recover the costs of primary restoration. Rather, they want Shell to pay for more investigation. Plaintiffs' claims rest on an expert report which states that further investigation "may" reveal the necessity of additional remediation or for primary restoration—or may reveal nothing.

*Id.* at *3. The MDL Court noted that "plaintiffs have not cited a single case in which the NJDEP

has recovered 'primary restoration costs' for investigation alone[,]" and that "[p]laintiffs have

not alleged any specific deleterious environmental impact, or suggested what restoration

measures would eventually need to be performed." *Id.* at *3. The court therefore focused on the

lack of evidence of whether "restorative measures" were "necessary" at all, not whether specific

restorative measures were justified by an injury or threat to human health, flora, or fauna.[15]

Accordingly, although the MDL Court superficially endorsed the *Essex* standard in dicta, it was

not called upon, as is this Court in the present action, to answer the question of whether some

heightened standard, or the statutory "practicability" standard, should govern the award of

primary restoration damages. Because the MDL Court had no occasion to consider the question

now before this Court, and in fact did not do so, *In re MTBE* is not inconsistent with this Court's

holding.[16]

---

[15] For the purposes of this motion, this Court need not determine whether the MDL Court's finding that investigative costs are not properly included within primary restoration damages was legally correct. It is sufficient to observe that the MDL Court's holding was based on the finding that only investigative and not primary-restoration-type damages were sought, not a finding that the sought damages were based on an impracticable plan or a plan not justified by an injury or threat to human health, flora or fauna.

[16] The Court also notes that the MDL Court in its February 2014 opinion did not have the benefit of the opinion of the New Jersey Superior Court in *Bayway*, issued in August 2015, which, as this Court has explained above, helped clarify the applicable standard for a plaintiff's burden of proof for primary restoration damages under the Spill Act.

Accordingly, because *Essex* and *Union Carbide* are clearly distinguishable from the case at bar, and *In re MTBE* did not specifically address the correct standard for the burden of proof for Plaintiffs to establish primary restoration damages and instead was resolved on the basis of deficiencies in the plaintiffs' expert reports not currently before this Court, I reject Defendants' contention that the New Jersey courts have imposed a heightened standard of "an injury or threat to human health, flora, or fauna," over and above the statutory requirement that damages be based upon on a primary restoration plan that is "practicable."

IV. CONCLUSION

Accordingly, the Court finds that Plaintiffs' burden of proof at trial on their claims for primary restoration damages will be to establish by a preponderance of the evidence that Plaintiffs' primary restoration plan is "practicable," meaning "reasonably capable of being done" or "feasible" in light of "site-specific realities," including but not limited to the estimated length of time required to complete the restoration plan, the cost of the restoration plan, the extent to which the restoration plan is concrete, nonabstract and readily implementable rather than abstract or conceptual, the regulatory approvals required for the restoration plan from authorities other than NJDEP, and any other legal obstacles or barriers to the implementation of the restoration plan, including, for example, the current ownership of contaminated sites and the legal authority of the responsible parties to conduct restoration work at the sites. Defendants' motion *in limine* for leave to file, beyond the deadline set by the MDL Court, a motion for partial summary judgment based upon the alternative burden of "a significant threat to human health, flora, or fauna," is, therefore, not supported by good cause and is denied. Further, absent rulings on the reliability of the opinions of the parties' experts and the scope of those opinions on primary

restoration, I do not perceive a basis for a dispositive motion under the "practicable" standard

enunciated in this Opinion, since that standard requires a fact and circumstance specific inquiry.


Dated: _____11/7/2017_____          _____/s/ Freda L. Wolfson_____

The Honorable Freda L. Wolfson
United States District Judge